**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

PRINICPAL SECURITIES, INC.,

                Petitioner,

   vs.

SANJEEV AGARWAL, RAJSHRI AGARWAL, and
TECHNOCHEM INTERNATIONAL, INC.,

                Respondents.

Case No. 4:20-cv-00257

## RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S MOTION FOR PRELIMINARY AND PERMANENT <u>INJUNCTION</u>

BOLIVER LAW FIRM
Gail E. Boliver, AT0001032
2414 S. 2nd Street
Marshalltown, IA 50158
Tel: (641) 752-7757
Email: boliver@boliverlaw.com

GANA WEINSTEIN LLP
Adam J. Weinstein, Esq.
345 Seventh Avenue, 21st Floor
New York, NY 10001
Tel: (212) 776-4251
Email: awesintein@ganallp.com
*Motion for Pro-Hac Vice Forthcoming
Attorneys for Respondent Technochem
International, Inc.*

FITAPELLI KURTA
Jonathan Kurta, Esq.
28 Liberty Street, 30th Floor
New York, New York 10005
Phone: (212) 658-1502
Email: jkurta@fkesq.com
*Motion for Pro-Hac Vice Forthcoming
Attorneys for Respondents Sanjeev Agarwal
and Rajshri Agarwal*

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................. 1

STANDARD OF REVIEW ................................................................................................. 5

LEGAL ARGUMENT ....................................................................................................... 6

   I.    The Parties Agreed to Arbitrate their Dispute Pursuant to FINRA Rule 12200 ................. 6

   II.   Respondents Were PSI's Customer Because They Were Customers of Mr. Krohn, PSI's Associated Person. ........................................................................................................ 8

   III.  Respondents Dispute Arose in Connection with PSI's Business Activities ..................... 13

   IV.  PSI's Arguments Do Not Alter the Determinative Facts and Are Unpersuasive ............. 16

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*AT&T Tech, Inc. v. Communications Workers,*
   475 U.S. 643 (1986) ................................................................................................ 6

*Bell v. Cendant Corp.,*
   293 F.3d 563 (2d Cir. 2002) .................................................................................... 6

*Bensadoun v. Jobe-Riat,*
   316 F.3d 171 (2d Cir. 2003) .................................................................................... 7

*Berthel Fisher & Co. v. Larmon,*
   695 F.3d 749 (8th. Cir. 2012) ................................................................................ 16

*Cal. Fina Group, Inc. v. Herrin,*
   379 F.3d 311 (5th Cir. 2004) ................................................................................... 9

*Chelsea Morgan Sec., Inc. v. Rappaport,*
   3 F. Supp. 3d 791 (C.D. Cal. 2014) ..................................................................... 10

*Daugherty v. Washington Square Securities, Inc.,*
   271 F.Supp.2d 681 (W.D.Pa. 2003) ..................................................................... 10

*Deutsche Bank Sec., Inc. v. Simon,*
   No. 19-20053-CIV, 2019 WL 4685876 (S.D. Fla. Sept. 26, 2019) ....................... 19

*Faust v. Command Ctr., Inc.,*
   484 F. Supp. 2d 953 (S.D. Iowa 2007) .................................................................. 6

*Fields v. NCR Corp.,*
   683 F. Supp. 2d 980 (S.D. Iowa 2010) .................................................................. 6

*Herbert J. Sims & Co., Inc. v. Roven,*
   548 F.Supp.2d 759 (N.D.Cal. 2008) ...................................................................... 7

*John Hancock Life Ins. Co. v. Wilson,*
   254 F.3d 48 (2d Cir. 2001) ........................................................................ 8, 14, 18

*Larry's United Super, Inc., v. Werries,*
   253 F.3d 1083 (8th Cir. 2001) ................................................................................ 6

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis,*
   903 F.2d 109 (2d Cir.1990 ...................................................................................... 7

*Miller v. Flume,*
   139 F.3d 1130 (7th Cir. 1998) .............................................................................. 18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.,*
   473 U.S. 626 (1985) ................................................................................................ 6

*Mony Sec. Corp. v. Bornstein,*
   390 F.3d 1340 (11th Cir. 2004) ................................................................... 9, 17, 18

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)........................................................................................................... 5

*Multi-Financial Securities Corp v. King*,
  386 F.3d 1364 (11th Cir. 2004) .............................................................. 10, 11, 12

*NDX Advisors, Inc. v. Advisory Fin. Consultants, Inc.*,
  No. C 11-3234, 2012 WL 6520689 (N.D. Cal. 2012) ............................................ 7

*Next Fin. Grp., Inc. v. GMS Mine Repair & Maint., Inc.*,
  No. 3:19-CV-168, 2020 WL 924209  (W.D. Pa. Feb. 26, 2020)............................ 10

*O.N. Equity Sales Co. v. Cui*,
  2008 U.S. Dist. LEXIS 6828 (N.D. Cal. 2008 ...................................................... 10

*O.N. Equity Sales Co. v. Hoegler*,
  No. CIV.A.07-2703(FLW), 2008 WL 304924  (D.N.J. Jan. 28, 2008)................... 11

*O.N. Equity Sales Co. v. Prins*, |
  519 F. Supp. 2d 1006 (D. Minn. 2007 ............................................................. 12, 14

*O.N. Equity Sales Co. v. Steinke*,
  504 F. Supp. 2d 913 (C.D. Cal. 2007) .............................................................. 8, 10

*O.N. Equity Sales Co. v. Wallace*,
  2007 U.S. Dist. LEXIS 84945 (S.D. Cal. 2007) ................................................... 10

*Oppenheimer & Co. v. Neidhardt*,
  56 F.3d 352 (2d Cir. 1995)................................................................................... 10

*Pictet Overseas, Inc. v. Helvetia Trust*,
  905 F.3d 1183 (11th Cir. 2018) ........................................................................... 18

*Ross Sinclaire & Assocs. v. Premier Sr. Living*,
  *LLC,* No. 11-CV-5104 YGR, 2012 WL 2501115 (N.D. Cal. June 27, 2012) .......... 7

*Royal All. Assocs., Inc. v. Davis*,
  897 F. Supp. 783 (S.D.N.Y. 1995) ...................................................................... 18

*Shearson/American Express, Inc. v. McMahon*,
  482 U.S. 220 (1987)............................................................................................. 5

*Smith v. Bartolini*,
  No. 01 C 4311, 2003 WL 21148940 (N.D. Ill. May 14, 2003) .............................. 18

*Spear, Leeds & Kellogg v. Cent. Life Assur. Co.*,
  85 F.3d 21 (2d Cir. 1996)............................................................................... 7, 19

*Summit Brokerage Servs., Inc. v. Cooksley*,
  No. CA 02–11137 AO, 2002 WL 31478190 (Fla.Cir.Ct. Nov. 1, 2002) ................ 10

The *O.N. Equity Sales Co. v. Gibson*,
  514 F.Supp.2d. 857  (S.D. W.Va. 2007)................................................................ 11

The *O.N. Equity Sales Co.* v. Pals,
  509 F.Supp.2d. 761 (N.D. Iowa 2007)............................................................ 10, 11

*The O.N. Equity Sales Co. v. Rahne*r,
   No. 07–1323, 2007 U.S. Dist. LEXIS 90197, 2007 WL 4258642 (D. Colo. Nov. 30, 2007) .. 11

*The O.N. Equity Sales Co. v. Samules*,
   No. 07–1091, 2007 U.S. Dist. 90332 (M.D. Fla. Nov. 30, 2007) ........................................... 11

*The O.N. Equity Sales Co. v. Thiers*,
   No. 07–305, 2008 U.S. Dist. LEXIS 3765, 2008 WL 110603 (D. Ariz. Jan. 10, 2008) .......... 11

*The O.N. Equity Sales Co. v. Venrick*,
   508 F.Supp.2d 872 (W.D. Wash. 2007) ................................................................................... 11

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,*
   363 U.S. 574 (1960) ................................................................................................................... 6

*Vestax Sec. Corp. v. McWood,*
   280 F.3d 1078 (6th Cir. 2002) ........................................................................................... 10, 14

*Vestax Sec. Corp. v. Skillman,*
   117 F.Supp.2d 654 (N.D.Ohio 2000) ...................................................................................... 12

*Washington Square Sec., Inc. v. Aune*,
   385 F.3d 432 (4th Cir. 2004) .................................................................................................... 7

*Washington Square Sec., Inc. v. Sowers,*
   218 F. Supp. 2d 1108 (D. Minn. 2002) ............................................................................. 12, 14

*Waterford Inv. Servs. v. Bosco,*
   682 F.3d 348 (4th Cir. 2012) .................................................................................................... 9

*WMA Securities Inc. v. Ruppert,*
   80 F.Supp.2d 786 (S.D. Ohio 1999) ...................................................................................... 10

*World Group Securities, Inc. v. Sanders,*
   2006 WL 1278738 (D. Utah May 8, 2006) ............................................................................. 8

## FINRA Rules

FINRA Rule 12200 ........................................................................................................................ 6

FINRA Rule 3040(e)(1) ............................................................................................................... 14

Sanjeev Agarwal, individually and with Rajshri Agarwal on behalf of Technochem International, Inc. ("Technochem" and collectively "Respondents") respectfully submits this memorandum of points and authorities in opposition to Petitioner's motion for a preliminary and permeant injunction (the "Motion") and ask the Court, under 9 U.S.C. § 4, to compel Petitioner Principal Securities, Inc. ("PSI") to arbitrate Respondents' claims before FINRA.

## FACTUAL BACKGROUND

The parties agree on the essential and controlling facts of this case requiring FINRA arbitration – that "Claimants allege that they were solicited to invest in two companies— Glycerin Group LLC d/b/a KemX Global and Spotlight Innovation, Inc.— by Mr. Krohn and that…Principal is responsible for these interactions." PSI FINRA Answer, [Doc. 4-1] pg. 2. While the parties dispute many other facts and PSI's supervisory responsibilities – such disagreements are ultimately irrelevant to the issue at hand as to whether the parties agreed to arbitrate their dispute before FINRA.

As a background, Respondents alleged that Mr. Krohn defrauded Respondents by soliciting them for investments in several companies that Mr. Krohn managed and controlled as part of one large Ponzi scheme. Respondents alleged that "Mr. Krohn solicited numerous investors to pour approximately $40 million into these ventures and controlled the finances and operations of all of these companies."[1] FINRA Statement of Claim ("SOC") [Doc. 4] pg. 3. Respondents alleged that Mr. Krohn treated these companies and investor funds as one giant slush fund "by shuffling

---

[1] Respondents alleged that Mr. Krohn controlled the finances and operations of Spotlight Innovation, Inc. ("Spotlight"), Gooi Global, Inc. ("Gooi"), DomiKnow, K4, LLC ("K4" a/k/a K4 Enterprises LLC), Celtic Biotech, Memcine, and Glycerin Group, LLC dba KemX Global ("KemX").

investor money from venture to venture in order to satisfy investors, banks, and other creditors until recently when these ventures collapsed under the weight of fraud and neglect." *Id.*

Respondents alleged that they formed a customer relationship with Mr. Krohn when he advised them concerning the KemX Global and Spotlight investment opportunities. Spotlight was a micro-cap penny stock company trading on under the ticker STLT. *Id.* at pg. 10. Spotlights' public filings state that it is a development stage company for healthcare companies. *Id.* Respondents alleged that Mr. Krohn controlled Spotlight, subsidiary companies affiliated with Spotlight, and provided Spotlight with investor financing. *Id.* at pg. 11. Respondent alleged that by March 2014, Spotlight had no revenues, no business prospects, and an accumulated loss of over $7 million – a loss that would grow to over $18 million by 2016. *Id.* at pg. 11-12. During this time period, Spotlight's losses were funded by Respondents' investments as well as the investments of dozens of other investors that Mr. Krohn solicited.

On August 25, 2016, while Mr. Krohn was associated with PSI, Mr. Krohn solicited Dr. Agarwal to invest in Spotlight. Declaration of Adam J. Weinstein ("Weinstein Dec."), Exhibit ("Ex.") A, Spotlight Email. After discussing the terms of an investment in Spotlight, Mr. Krohn, through his assistant Kevin Immel, invited the Agarwals to come to PSI's offices to drop off the subscription agreement to invest $250,000 in Spotlight. Weinstein Dec., Ex. B, Spotlight $250,000 Purchase Email; Weinstein Dec., Ex. C, Spotlight Stock Certificate. Dr. Agarwal asked Mr. Krohn to register the transaction and "convert the debt to common stock" in Spotlight immediately. Respondents alleged that in December 2016 Mr. Krohn again solicited the Agarwals to invest another $100,000 in Spotlight. FINRA SOC [Doc. 4], pg. 14.

Respondents alleged that Mr. Krohn used investor funds and the purchase of Spotlight stock to dump his own holdings of Spotlight stock to benefit himself. *Id.* at pg. 12. Respondents

alleged that Mr. Krohn used and abused his position to manipulate Spotlight and engage in a pump and dump scheme.  *Id.* at 13.

Similarly, Respondents alleged that beginning in late 2014 Mr. Krohn solicited them to invest in KemX - a production facility to produce USP grade Glycerin and refined cooking oil.  *Id.* at 3 and 7.  Respondents alleged that Mr. Krohn used a company called K4 "as a private equity fund in order to provide debt financing and make loans to the various and growing number of companies he was associated with."  *Id.* at 5-6.  Mr. Krohn solicited multiple investors including one of his wealthy clients – Michael Kemery – to provide millions in funding to K4 in exchange for a 50% ownership interest in K4.  *Id.* at 6.

"Dr. Agarwal would routinely meet with Mr. Krohn and his staff at Principal to discuss the KemX deal."  *Id.* at 6.  As alleged, over time Technochem loaned KemX "certain plant and equipment that was already in its possession, additions to plant and equipment, warehousing and office space, land, and labor worth over $9 million to Mr. Krohn's KemX venture."  *Id.* at 3.  Respondents' investment in KemX was made in exchange for an equity interest in KemX plus the recognition of loans "as debt on KemX's balance sheet."  *Id.*

However, "Mr. Krohn abused his position and control of KemX by indebting the company and otherwise using funds to finance his other business ventures."  *Id.* at 9.  Respondents alleged that it was Mr. Krohn who "completely controlled KemX's books and records as well as bank accounts and finances."  *Id.*  One way in which it appears Mr. Krohn abused his authority and position at KemX was to use "KemX's plant assets as collateral or proof of assets to acquire bank loans and otherwise diverted operating funds to finance other business or personal purchases of Mr. Krohn."  *Id.*  Respondents alleged that Mr. Krohn caused KemX to drown in approximately

$37 million in debt with $20.5 million owed to banking institutions, $9.3 million owed to Technochem, and $4.3 million due to K4. *Id.*

As shown, Respondents concerns that Mr. Krohn stole funds and otherwise abused the assets of KemX are well-founded. Weinstein Dec., Ex. D, KemX 2018 Balance Sheet. Exhibit D supports the debts alleged and the $20.5 million in bank loans whose use was not to pay back loans from Respondents. Further, one line item specifically references that at some point a loan to GOOI, LLC – another company controlled by Mr. Krohn – was made by KemX. *Id.*

Moreover, the lines between the different companies became increasingly blurred to the point of irrelevance over time. At times, Mr. Krohn would have Spotlight's CPA contact Dr. Agarwal to discuss funds and equipment lent to KemX as if it were natural for Spotlight's Chief Financial Officer to be involved in the finances of another company. Weinstein Dec., Ex. E, Email From Bill Pim Concerning KemX. In addition, because Mr. Krohn, via KemX, incurred huge debts to Respondents, Dr. Agarwal attempted to appease Mr. Krohn and ensure the repayment of the KemX loans by continuing to invest in Spotlight. In one email, the Agarwals agree to invest $400,000 in Spotlight, reduce $350,000 in KemX debt, and wanted to negotiate royalty payout on Spotlight. Weinstein Dec., Ex. F, Email re $400,000 Spotlight Investment. Eventually, Mr. Krohn began soliciting investors to invest directly in K4 as a way to invest in all of Mr. Krohn's other companies including KemX and Spotlight. Weinstein Dec., Ex. G, Email re K4 Investment.

Technochem feared that they could be held responsible for KemX's debts. Accordingly, when the company was sold in June 2019, Respondents relinquished their rights as a creditor and debt holder of KemX in exchange for a release of liability. FINRA SOC [Doc. 4], pg. 10. The transaction resulted in a complete loss of Technochem's investment in KemX. *Id.*

4

In a news article, several other of Mr. Krohn's investors or their counsels were interviewed concerning Mr. Krohn's investment solicitations.[2]  The investors in the article make substantially similar allegations against Mr. Krohn.  The investors allege that Mr. Krohn defrauded them by soliciting them to invest in various business and engaged in Ponzi scheme like behavior by commingling funds amongst his various business ventures.  *Id.*  PSI is currently arbitrating claims made by at least 13 other investors including a $28 million claim by Mr. Kemery – Mr. Krohn's business partner and 50% owner of K4.  FINRA itself, also sanctioned Mr. Krohn for engaging in private securities transactions and failing to disclose the true nature of his outside business activities ("OBAs").  Weinstein Dec., Ex. H, *FINRA v. John Krohn.*

In sum, Respondents have alleged and there is evidence sufficient to show that Mr. Krohn solicited Respondents to invest in various companies whose finances were controlled by Mr. Krohn.  Respondents alleged that PSI had a duty to supervise Mr. Krohn under the securities laws.  PSI was obligated to not only evaluate and approve Mr. Krohn's OBAs but to detect and prevent his private securities transactions or "selling away" activity.  PSI, by failing to prevent Mr. Krohn's solicitation of investor funds, failed to prevent Mr. Krohn from commingling and misappropriating investor assets.

## STANDARD OF REVIEW

By passing the Federal Arbitration Act ("FAA"), 9 U.S.C. §4, Congress established a "federal policy favoring arbitration." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (*quoting Moses H. Cone Mem. Hosp. V. Mercury Constr. Corp.*, 460 U.S. 1 (1983) (internal quotations omitted).  This policy has translated into a judicial presumption of arbitrability.

---

[2] Heitshusen, Sonya, *An Investor's Nightmare,* WHO 13, Des Moines (Dec. 19, 2019) (available at: https://who13.com/news/an-investors-nightmare/); Part II (available at: https://who13.com/news/special-reports/an-investors-nightmare-part-2/

*AT&T Tech, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986).   Thus, a court may not deny arbitration unless "it may be said with positive assurance" that arbitration is inappropriate. *Id*. at 650.   Accordingly, the parties' intentions to arbitrate are "generously construed" as to issues of arbitrability and any ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration.   *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.,*473 U.S. at 626 (1985).  In sum, "[d]oubts should be resolved in favor of coverage."   *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83 (1960); *see also Bell v. Cendant Corp.,* 293 F.3d 563, 566 (2d Cir. 2002).

In the Eighth Circuit, "the district court's role is limited to determining: (1) whether there is a valid agreement between the parties, and (2) whether the claim falls within the arbitration agreement."   *Faust v. Command Ctr., Inc.,* 484 F. Supp. 2d 953, 954 (S.D. Iowa 2007) (*citing Larry's United Super, Inc., v. Werries,* 253 F.3d 1083, 1085 (8th Cir. 2001) (noting that the review should address "only such issues as are essential to defining the nature of the forum in which a dispute will be decided").  "Once the Court determines that there is a valid arbitration agreement and that the specific dispute at issue falls within the substantive scope of that agreement, the Court must compel arbitration and its duties are at an end."   *Id.* (*citing Werries,* 253 F.3d at 1086); *see also Fields v. NCR Corp.,* 683 F. Supp. 2d 980, 984 (S.D. Iowa 2010) (same)

Respondents can show that an arbitration agreement exists and that the dispute falls within the scope of the agreement.

## **LEGAL ARGUMENT**

**I.**   **The Parties Agreed to Arbitrate their Dispute Pursuant to FINRA Rule 12200.**

Pursuant to the FINRA Code of Arbitration Procedure for Customer Disputes Rule 12200:

Parties must arbitrate a dispute under the Code if:

6

• Arbitration under the Code is either:

   (1) Required by a written agreement, or
   (2) Requested by the customer;

• The dispute is between a customer and a member or associated person of a member; and

• The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

Weinstein Dec., Ex. I, FINRA Rule 12200.

Courts around the country have held that "[t]he NASD[3] Code constitutes an 'agreement in writing' under the Federal Arbitration Act, 9 U.S.C. § 2, which binds [NASD member firms], as an NASD member, to submit an eligible dispute to arbitration upon a customer's demand." *Washington Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004); *Spear, Leeds & Kellogg v. Cent. Life Assur. Co.*, 85 F.3d 21, 26 (2d Cir. 1996) ("the arbitration rules of a securities exchange are themselves 'contractual in nature.'") (*quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis*, 903 F.2d 109, 113 (2d Cir. 1990)); *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 176 (2d Cir. 2003) ("interpretation of the NASD arbitration provision is a matter of contract interpretation…[t]he analysis differs from ordinary contract interpretation in that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.") (internal citations and quotations omitted); *NDX Advisors, Inc. v. Advisory Fin. Consultants, Inc.*, 2012 U.S. Dist. LEXIS 176977, at *7 (N.D. Cal. 2012) (stating that the FINRA Code of Arbitration

---

[3] The National Association of Securities Dealers ("NASD"), is the predecessor of FINRA. "Cases interpreting and apply Rule 10301 apply equally to Rule 12200 since there was no substantive change to the rule." *Ross Sinclaire & Assocs. v. Premier Sr. Living, LLC*, No. 11-CV-5104 YGR, 2012 WL 2501115, at *6 (N.D. Cal. June 27, 2012) (*citing Herbert J. Sims & Co., Inc. v. Roven*, 548 F.Supp.2d 759, 763 n. 2 (N.D.Cal. 2008)).

constitutes an "agreement in writing" to arbitrate, within the meaning of the FAA); *O.N. Equity Sales Co. v. Steinke,* 504 F. Supp. 2d 913, 916 (C.D. Cal. 2007) ("numerous courts have held that even if 'there is no direct written agreement to arbitrate . . ., the [NASD] Code serves as a sufficient agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants.'") (*citing World Group Securities, Inc. v. Sanders,* 2006 WL 1278738 (D. Utah May 8, 2006) (*quoting MONY Secs. Corp. v. Bornstein,* 390 F.3d 1340, 1342 (11th Cir. 2004))).

Because FINRA Rule 12200 constitutes an 'agreement in writing' the presumption in favor of arbitrability applies unless PSI can show with positive assurance that Respondents were not customers of PSI's associated person – Mr. Krohn.

## II.   Respondents Were PSI's Customer Because They Were Customers of Mr. Krohn, PSI's Associated Person.

PSI advances the classic "account requirement" argument that courts routinely reject under FINRA Rule 12200.   Courts have universally rejected claims by the brokerage industry that FINRA's arbitration agreements require investors to have accounts with the brokerage firm being sued.

This issue was addressed in the Second Circuit in *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48 (2d Cir. 2001).   In *John Hancock,* the investors claimed that John Hancock was liable for "failure to supervise and respondeat superior, for the losses they incurred…" *Id.* at 51-52.   The facts of the case are similar to those present in this matter:

> Beginning in or about early 1998, Fucilo sold fraudulent promissory notes to the Investors. The Investors are customers of Fucilo. They are not customers of John Hancock. There is no evidence that Fucilo represented to the Investors that he was affiliated with John Hancock, or that the Investors knew that Fucilo was affiliated with John Hancock. Fucilo had no authority from John Hancock to sell the fraudulent investment products, nor did John Hancock have any knowledge that Fucilo was selling these products.

*John Hancock,* at 51.

The brokerage firm made the same argument Petitioner asserts in this matter.  The district court held and the Second Circuit upheld that:

> what is important is that the [Investors] were customers of a person associated with [John Hancock]. Because [the Investors] were Fucilo's customers and Fucilo was associated with [John Hancock], this dispute is arbitrable.

*Id.* at 57.

"John Hancock argues that the Investors must be customers of John Hancock and not merely of an associated person…'the term 'customer' plainly refers <u>to either</u> the member['s] <u>or</u> the associated person['s] customer.'"  *Id.* at 59 (emphasis added).  The plain language of FINRA Rule 12200 compels arbitration when the investor is either a customer of the associated person <u>or</u> the firm and does not require a direct relationship with the firm.

Every circuit that has addressed the issue has agreed with *John Hancock* and has found that having a direct relationship with the brokerage firm is not a requirement to compel arbitration against the firm when the investor is a customer of the firm's associated person.  *See, e.g., Waterford Inv. Servs. v. Bosco,* 682 F.3d 348, 353 (4th Cir. 2012) ("[A] member must arbitrate the claims of its associated person's customers. The only issue in dispute, therefore, is whether Gilbert was an 'associated person' of Waterford during the events in question such that the Investors— Gilbert's customers—can compel Waterford to arbitrate the dispute."); *Mony Sec. Corp. v. Bornstein,* 390 F.3d 1340, 1344 (11th Cir. 2004) (mandating arbitration between the Borsteins, the investors, and MONY, the broker-dealer firm, where "there is no dispute that the Bornsteins were customers of Keller and that Keller was an associated person with MONY."); *Cal. Fina Group, Inc. v. Herrin,* 379 F.3d 311, 318 (5th Cir. 2004) ("'[C]ustomer' as used in Rule [12200's predecessor] is plainly broad enough to include persons who purchased securities from a registered

representative of an NASD–member firm, a.k.a. an 'associated person . . . .'"); *Vestax Sec. Corp. v. McWood*, 280 F.3d 1078, 1081-82 (6th Cir. 2002) (holding that investors were entitled to arbitrate their dispute with the broker-dealer firm even though they never established an account with the firm or purchased securities through it, because the investors purchased securities from stockbrokers associated with the firm); *Multi-Financial Securities Corp v. King*, 386 F.3d 1364, 1366 (11th Cir. 2004) (upholding district court finding that "a customer's direct dealings with an associated person of a[n] NASD member are sufficient to compel a[n] NASD member into arbitration"); *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352 (2d Cir. 1995) (rejecting Oppenheimer's argument that the investors must have opened accounts with Oppenheimer to be its customers.).

There are dozens more District Court authorities across the country that have had similar rulings.[4]  Each of these cases has specifically addressed and rejected the primary argument that

---

[4] *Chelsea Morgan Sec., Inc. v. Rappaport*, 3 F. Supp. 3d 791, 793 (C.D. Cal. 2014) ("the Rappaports were customers of Duggins who, in turn, was an associated person of Chelsea. The Rappaports have requested arbitration. Arbitration has therefore been requested by a "customer" within the meaning of the rule, and the requirement of subsection one of Rule 12200 is satisfied."); *see also Steinke*, 504 F. Supp. at 914-15; *O.N. Equity Sales Co. v. Cui*, 2008 U.S. Dist. LEXIS 6828 at *8 (N.D. Cal. 2008) ("The Court thus finds that Maria Cui was a 'customer' of Lancaster during the period when Lancaster was an 'associated person' of [the broker-dealer firm] … Accordingly, Maria Cui is a customer entitled to demand arbitration …."); *O.N. Equity Sales Co. v. Wallace*, 2007 U.S. Dist. LEXIS 84945, 11 (S.D. Cal. 2007) (ONESCO must arbitrate the investor's failure to supervise claims arising out of Lancaster's activities while he was an associated person of ONESCO); *Daugherty v. Washington Square Securities, Inc.,* 271 F.Supp.2d 681, 689 (W.D.Pa. 2003) (determining that the plaintiffs were customers within the meaning of Rule 10301(a) because a registered representative of a NASD-member firm sold them financial products); *WMA Securities Inc. v. Ruppert,* 80 F.Supp.2d 786, 789 (S.D. Ohio 1999); *Next Fin. Grp., Inc. v. GMS Mine Repair & Maint., Inc.,* No. 3:19-CV-168, 2020 WL 924209, at *4 (W.D. Pa. Feb. 26, 2020) ("Defendant is a customer of Plaintiff because Defendant purchased investment services from Simanski, an associated person of Plaintiff"); *Summit Brokerage Servs., Inc. v. Cooksley,* No. CA 02–11137 AO, 2002 WL 31478190 (Fla.Cir.Ct. Nov. 1, 2002) ("[B]y dealing with [the firm's] registered representative, [the investor] became a customer of that firm for purposes of NASD arbitration obligations."); *The O.N. Equity Sales Co. v. Pals,* 509 F.Supp.2d 761, 769 (N.D. Iowa 2007); *The O.N. Equity Sales Co. v. Venrick,* 508 F.Supp.2d 872, 875–76

Petitioner presents – that in order to compel arbitration the investor must open an account with PSI.  Yet, despite 20 years of clear and continually reinforced precedent on this issue, Petitioner makes these same tired arguments here.

The cases in the Eighth Circuit that have dealt with advisors engaging in private securities transactions and OBAs, like courts nationwide, compel FINRA arbitration.  In *O.N. Equity Sales Co. v. Pals,* advisor "Lancaster was the trustee of a private placement offered by Lancorp Financial Fund…" 509 F. Supp. 2d 761, 765 (N.D. Iowa 2007).  The Lancorp Fund turned out to be a Texas-based Ponzi scheme.  *Id.* at 766.  Pals contended that ONESCO was negligent in supervising Lancaster causing the investor's losses.  *Id.*

The court dismissed ONESCO's arguments requiring the firm to be involved in the investment at issue.  ONESCO claimed "that Lancaster did not disclose to ONESCO his prior or continuing involvement with the Lancorp Fund" and that "ONESCO was unaware of Lancaster's involvement with the Lancorp Fund."  *Id.* at 765.  The court determined that all that was needed to be shown was that the investor was a customer "to either a member's or an associated person's customer" which "affords customers of an associated person a right to compel arbitration against a member."  *Id.* at 769 (*citing King,* 386 F.3d at 1369.).  "As the court in *King* concluded, 'When an investor deals with a member's agent or representative, the investor deals with the member.'" *Id.* (*quoting King,* 386 F.3d at 1370).

---

(W.D. Wash. 2007); *The O.N. Equity Sales Co. v. Thiers,* No. 07–305, 2008 U.S. Dist. LEXIS 3765, at *10–11, 2008 WL 110603 (D. Ariz. Jan. 10, 2008); *The O.N. Equity Sales Co. v. Rahner,* No. 07–1323, 2007 U.S. Dist. LEXIS 90197, at *17–18, 2007 WL 4258642 (D. Colo. Nov. 30, 2007); *The O.N. Equity Sales Co. v. Gibson,* 514 F.Supp.2d. 857, 864 (S.D. W.Va. 2007); *The O.N. Equity Sales Co. v. Samules,* No. 07–1091, 2007 U.S. Dist. 90332, at *15–16 (M.D. Fla. Nov. 30, 2007); *O.N. Equity Sales Co. v. Hoegler,* No. CIV.A.07-2703(FLW), 2008 WL 304924, at *3 (D.N.J. Jan. 28, 2008).

The Eleventh Circuit *King* decision, relied on by the *Pals* court, found the Second Circuit's *John Hancock* decision persuasive on the interpretation of NASD Code.  *King*, 386 F.3d at 1369-70 ("this Court only can conclude that the *John Hancock* interpretation is consistent with the NASD members' reasonable expectations."); *see also O.N. Equity Sales Co. v. Prins,* 519 F. Supp. 2d 1006, 1010 (D. Minn. 2007) ("Defendants were clearly Mr. Lancaster's customers, because Mr. Lancaster provided investment services to Defendants when he sold them shares in the Lancorp fund.")

Similarly, in another case in the Eighth Circuit, *Washington Square Sec., Inc. v. Sowers,* the court found that the brokerage firm presented absolutely "no case law in support of its position" that customers are only those investors with accounts at the firm.  218 F. Supp. 2d 1108, 1117 (D. Minn. 2002).  The court found that "[w]hen a broker is alleged to have committed fraud and other wrongdoing, it is quite conceivable that monies would be misappropriated or wrongly invested, and would therefore not travel through [the brokerage firm's] regular accounts." *Id.*  at 1117.  The court rejected the same defenses PSI makes stating that "'the fact that defendants [the investors] never opened accounts with plaintiff [ ] irrelevant."  *Id.* at 1116 (*quoting Vestax Sec. Corp. v. Skillman,* 117 F.Supp.2d 654, 657 (N.D.Ohio 2000) *aff'd* 280 F.3d 1078 (6th Cir.2001); *WMA Sec., Inc. v. Wynn,* 32 Fed.Appx. 726, 2002 U.S.App. LEXIS 6247 (6th Cir. April 1, 2002) (unpublished) (finding investment firm's lack of knowledge about both customers and transactions, and the absence of contract do not negate customer status))).

Accordingly, courts in the Eighth Circuit have followed the nationwide consensus and settled law that when a customer deals with a firm's associated person they deal with the member and can compel arbitration.

Here, the parties agree on the essential and controlling facts – that "Claimants allege that they were solicited to invest in two companies— Glycerin Group LLC d/b/a KemX Global and Spotlight Innovation, Inc.— by Mr. Krohn…"   PSI FINRA Answer, [Doc. 4-1], pg. 2. Respondents alleged that Mr. Krohn solicited numerous investors and misused over $40 million into various ventures that he alone controlled the finances for.  SOC [Doc. 4], pg. 3.  Respondents alleged Ponzi-like behavior where Mr. Krohn treated his numerous companies and businesses as one giant slush fund.  *Id.*  Respondent provided evidence that Mr. Krohn solicited Dr. Agarwal to invest in Spotlight.   Weinstein Dec., Exs. A-C.   Respondents also produced evidence that Respondents loaned millions to KemX from 2014 through early 2019 which appear as debts on the company's balance sheet.  Weinstein Dec., Ex. D.   Respondents also alleged, with some supporting evidence, that Mr. Krohn used Respondents' investment assets to obtain $20.5 million in bank loans whose use is alleged to have been to fund other ventures.  *Id.*  Finally, Respondents produced evidence that Mr. Krohn began soliciting investors to invest directly in his private equity firm K4 as a way to invest in all of Mr. Krohn's companies including KemX and Spotlight. Weinstein Dec., Ex. G.

There can be no doubt that Respondents are customers of Mr. Krohn who solicited investments and handled Respondents funds while associated with PSI during the time the firm was alleged to have failed to supervise his activities.  These undisputed facts make it clear that Respondents are entitled to compel PSI to arbitrate their dispute.

**III.**   <u>**Respondents Dispute Arose in Connection with PSI's Business Activities**</u>

The third prong of the FINRA Rule 12200 arbitrability test is met here because the dispute arises in connection with the business activities of PSI. A dispute that arises from a firm's lack of supervision over its associated persons necessarily "arises in connection with its business" for the

purposes of Rule 12200. *See Vestax Secs. Corp,* 280 F.3d at 1082 ("A dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business."); *John Hancock,* 254 F.3d at 58-59 (stating that "[a] dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business" and that, in the alternative, the dispute is arbitrable because it arises out of the business of the firm's associated person); *Sowers,* 218 F. Supp. 2d at ("Both the Second and Sixth Circuits have found such a claim, when asserted against a brokerage firm alleged to have failed to properly supervise, 'arises in connection with its business.'"); *Prins,* 519 F. Supp. 2d at 1012 ("Regardless of whether ONESCO knew about the Lancorp fund, ONESCO was obliged to supervise Mr. Lancaster while he was their registered representative" and such "allegations of failed supervision arise in connection with ONESCO's business.") (citations omitted).

Respondents' allegations are that Mr. Krohn's involvement and control over investments in KemX and Spotlight constituted OBAs and private securities transactions under the FINRA Rules subject to supervision under Rules 3030 and 3040(c).; *see also* FINRA SOC [Doc. 4], pg. 20-21 ("the duty of supervision includes an obligation to investigate and to 'and to act upon the results of such investigation.' These obligations extend to supervision of a registered representative's outside business activities.").

FINRA Rule 3040(e)(1) defines "Private securities transaction" as "any securities transaction outside the regular course or scope of an associated person's employment with a member, including, though not limited to, new offerings of securities which are not registered with the Commission." The rationale for requiring brokerage firms to supervise every transaction, even private transactions, their brokers engage in – no matter where the account or transaction is located

- is clear under NASD NTM 91–32.[5] The notice states that "to conclude otherwise would permit registered persons to participate in securities transactions outside the scope of the oversight and supervision of the employer member and of a self-regulatory organization to the potential detriment of customers."

In addition, FINRA and the SEC have repeatedly defended the right of investors to compel firms to answer the misdeeds of their agents regardless of whether or not the customer opened an account with the firm.  As far back as 1985, the NASD warned brokerage firms that they "may be liable for the actions of the associated person even though the firm was not aware of his or her participation in the transaction." NTM 85-54: Proposed New Rule of Fair Practice Relating to Private Securities Transactions[6].  When crafting the current motion to dismiss rules within FINRA the SRO made it absolutely clear that they were not meant to deny investors the right to bring selling away claims against brokerage firms.  *See Order Approving Proposed Rule Change,* 74 Fed. Reg. 731, 736 n.37 (Jan. 7, 2009).  The SEC notes in approving the rules that:

> FINRA reiterated its position that "selling away" claims are arbitrable under the Codes.  Under the Codes, FINRA accepts cases brought by customers against associated persons in selling away cases, **and cases by customers against the associated person's member firm if there is any allegation that the member was or should have been involved in the events, such as an alleged failure to supervise the associated person.**

*Id.* (emphasis added).

SEC and FINRA guidance, case law, and all relevant court precedent could not be clearer - FINRA arbitration is appropriate where a broker sells an investment away from the firm and the investor does not have an account with the firm.  OBA and selling away activities and their

---

[5] Available at: https://www.finra.org/rules-guidance/notices/91-32

[6] Available at: https://www.finra.org/rules-guidance/notices/85-54

supervision are within the scope of the firm's business activities.  Indeed, preventing brokers from engaging in unmonitored frauds is a critical supervisory responsibility of FINRA members to protect the investing public.

## IV.   PSI's Arguments Do Not Alter the Determinative Facts and Are Unpersuasive

Against the weight of authority PSI argues that Respondents need an account with PSI to arbitrate their claims.  PSI claims repetitively through their papers that Respondents are not customers because they did not have brokerage accounts at PSI.  Complaint [Doc 1], pg. 6-7; PSI Memo of Law [Doc. 7-1], pg. 1, 6-7.  However, not a single case was cited for this proposition.

As shown *supra,* all that needs to be shown is that Respondents are customers of Mr. Krohn – the firm's associated person, which has been clearly shown in this case.  In fact, even PSI admits that such facts standing alone satisfy the customer requirement.  PSI Memo of Law [Doc. 7-1], pg. 5 ("[C]ustomers of associated persons of a firm may compel arbitration with the firm." (*quoting Berthel Fisher & Co. v. Larmon,* 695 F.3d 749, 753 (8th. Cir. 2012))).

Next, PSI believes by calling Respondents "business partners" of Mr. Krohn instead of "customers" the firm can avoid arbitrating Respondents dispute.  PSI Memo of Law [Doc. 7-1], pg. 1 ("Respondents were business partners of Mr. Krohn outside of his capacity as a PSI registered representative and were at all times involved in business ventures rather than securities transactions that any party believed were in any way connected to PSI.").  PSI's argument fails to dispute that Mr. Krohn rendered investment advice and services to Respondents.  As shown, Mr. Krohn clearly solicited and recommended investments in Spotlight and KemX by promising royalties, equity interests, and debt and loan repayment terms.  PSI's bare assertions to the contrary are unsupported.  Further, PSI's defense is a truism since every investment necessarily involves a "business venture." Moreover, shareholders are by definition the owners of the companies they invest in.  What is

important is that Mr. Krohn recommended the investment to Respondents – not the title granted to the investor upon making the investment.

PSI has also failed to cite a single case where a similarly situated investor's claims were not arbitrable because the investor was declared a "business partner" by the court.  In fact, courts have counseled against straying from the determinative and uncontested facts controlling the FINRA Rule 12200 determination.  As the Eleventh Circuit has stated:

> So while there many be dozens of disputed facts, the facts that matter in this case are undisputed: the Bornsteins were customers of Keller, who was an associated person of MONY. This undisputed fact pattern is somewhat common, and the overwhelming response is that the case is subject to arbitration.

*MONY Sec. Corp. v. Bornstein,* 390 F.3d 1340, 1346 (11th Cir. 2004).

PSI next claims that investors must allege a dispute involving securities transactions – a claim that is contrary to the plain language of the arbitration agreement.  Regardless, Respondents allegations do include securities transactions.  Respondents alleged that they were solicited to invest in Spotlight – a publicly traded company – and produced stock certificates.  FINRA SOC [Doc 4], pg. 10.  Respondents alleged that Mr. Krohn engaged in a pump and dump stock manipulation scheme concerning Spotlight.  *Id.* at 12.  A pump and dump scheme necessarily relates to a claim of illegal securities trading activity.  However, PSI's entire securities argument misses the mark since there is no such requirement in Rule 12200 nor does PSI cite a single supporting case.

Instead, the case law is clear that business activities of the member is broader than merely securities trading.  The NASD's arbitration agreement "is quite broad, sweeping in not only claims that literally 'arise out of' the business of the firm (i.e., its buying and selling activities), but also claims that have a 'connection' with the firm's business." *Miller v. Flume,* 139 F.3d 1130, 1136

(7th Cir. 1998) (finding claims involving fraudulent conveyances to be arbitrable); *Royal All. Assocs., Inc. v. Davis,* 897 F. Supp. 783, 788 (S.D.N.Y. 1995) (finding claims of an advisor misappropriating and borrowing funds arbitrable); *Smith v. Bartolini,* No. 01 C 4311, 2003 WL 21148940, at *8 (N.D. Ill. May 14, 2003) ("Smith has not cited to any case indicating that the NASD Code contains any requirement that the investor must have purchased a security as defined by the 1933 or 1934 Acts."); *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48 (involving promissory notes that are only securities under certain circumstances); *MONY Sec. Corp. v. Bornstein,* 390 F.3d 1340 (11th Cir. 2004) (involving purchased interests in third-party life insurance contracts).   In sum, FINRA arbitration can be compelled against a firm when their advisors engage in a wide array of financial dealings.   The common thread is that the advisor is trusted with the investor's funds whose trust is then abused by the advisor.

Respondents claim here is Mr. Krohn controlled various companies, including Spotlight and KemX, and misappropriated corporate assets.   FINRA SOC [Doc. 4] pg. 9.   In sum, Respondents investments – whether in Spotlight or in KemX – were utilized and controlled by Mr. Krohn to finance his own priorities and were not used for their intended purpose.   FINRA's rules concerning OBAs and selling away rules exist for the purposes of preventing advisors like Mr. Krohn from absconding with investor funds in order to purchase $4.75 million dollar mansions and amass extensive car collections.   *Id.* at 14.

Finally, PSI claims that "Respondents' claims did not arise in connection with the business activities of the member or the associated person as required under Rule 12200."   PSI cites *Pictet Overseas, Inc. v. Helvetia Trust,* for the proposition that firms "are not required to arbitrate claims that arise out of 'activities of the associated person that are unrelated to his or her relationship with the FINRA member.'"   905 F.3d 1183, 1189 (11th Cir. 2018).   PSI fails to show, and indeed,

18

cannot possibly show in this instance how Mr. Krohn's activities are unrelated to his relationship with PSI.

In this case, Mr. Krohn was sanctioned by FINRA precisely for failing to disclose his OBAs and engaging in private securities transactions – the same allegations made in the instant dispute. Weinstein Dec., Ex. H, *FINRA v. John Krohn*.   FINRA found that Mr. Krohn hid at least four businesses from PSI.   *Id.*   In addition, FINRA found that Mr. Krohn made purchases of at least $7.9 million in securities through private securities transactions.   *Id.*   Clearly, Mr. Krohn's OBAs and private securities transactions are not unrelated activities to his relationship with PSI as he was required to disclose those activities to the firm so that they could be evaluated and supervised.   In addition, Respondents have alleged that PSI was obligated to supervise Mr. Krohn sufficiently to prevent Mr. Krohn's violations of these same rules and was negligent in doing so.   In sum, PSI's argument is reduced to the absurd position that FINRA sanctioned Mr. Krohn concerning activities that FINRA does not regulate.

As the Second Circuit held:

> obliging a NYSE member to arbitrate a dispute so closely connected with behavior investigated and punished by the exchange may hardly be said to violate a member's reasonable expectations. *Cf. Leadertex,* 67 F.3d at 29. While plaintiff might not have known the specific parties that would be harmed by its violation of Exchange rules, it should reasonably have expected that a failure to obey NYSE rules would lead a party aggrieved by its conduct to seek arbitration of a claim arising from it.

*Spear, Leeds & Kellogg v. Cent. Life Assur. Co.,* 85 F.3d 21, 30 (2d Cir. 1996).

In addition, the holding in *Pictet Overseas,* is far removed from the facts of this case.   *Pictet Overseas,* "did not abrogate the holdings in *King* or *Mony.*"   *Deutsche Bank Sec., Inc. v. Simon,* No. 19-20053-CIV, 2019 WL 4685876, at *2 (S.D. Fla. Sept. 26, 2019).   The *Simon* court found that *Pictet Overseas,* only meant to limit clearly remote claims from FINRA arbitration such as a

tort claim arising from car accident while acting as a real estate agent because such activity "has nothing to do with the real estate agent's status as a partner of a FINRA member." *Id.*

Clearly the raising of millions in investor funds for numerous businesses that Mr. Krohn controlled and manipulated is profoundly different activity than a tort claim related to driving a real estate client.  In sum, *Pictet Overseas* does not assist PSI in showing that Mr. Krohn's activities were not related to the business activities of PSI.

In sum, Petitioner's defenses are against the weight of the evidence and are otherwise irrelevant.  Again, the only determinative facts in this case are that Respondents were customers of Mr. Krohn who provided investment advice to Respondents while he was an associated person of PSI.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Petitioner's motion for a preliminary and permanent injunction and compel PSI to arbitrate Respondents' claims before FINRA arbitration under 9 U.S.C. § 4.

Dated: September 4, 2020                Respectfully Submitted,
BOLIVER LAW FIRM

By: /s/ Gail E. Boliver
Gail E. Boliver, AT0001032
2414 S. 2nd Street
Marshalltown, IA 50158
Tel: (641) 752-7757
Email: boliver@boliverlaw.com

GANA WEINSTEIN LLP
Adam J. Weinstein, Esq.
345 Seventh Avenue, 21st Floor
New York, NY 10001
Tel: (212) 776-4251
Email: awesintein@ganallp.com
*Motion for Pro-Hac Vice Forthcoming
Attorneys for Respondent Technochem
International, Inc.*

FITAPELLI KURTA
Jonathan Kurta, Esq.
28 Liberty Street, 30th Floor
New York, New York 10005
Phone: (212) 658-1502
Email: jkurta@fkesq.com
*Motion for Pro-Hac Vice Forthcoming
Attorneys for Respondents Sanjeev Agarwal
and Rajshri Agarwal*

## CERTIFICATE OF SERVICE

I certify that on September 4, 2020, I electronically filed the foregoing with the Clerk of Court for the United States District Court for the Southern District of Iowa using the CM/ECF system. I also hereby certify that a copy of the above and foregoing has been served upon the following by email.

Angel A. West, AT0008416
NYEMASTER GOODE P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309
Telephone: 515-283-3100
Fax: 515-283-3108
Email: aaw@nyemaster.com

**COUNSEL FOR PRINCIPAL
SECURITIES, INC.**

  /s/ Gail E. Boliver